Thank you, Your Honor. I would like to reserve ten minutes for rebuttal, and I plan to focus on the analysis of the Doyle Fifth Amendment issue and submit on the briefs the argument about the Court's failure, the Court's silence in ruling on the downward departure request for lack of purity of the drug. With regard to this issue, I'd like to point out, I think it's agreed by all parties, that this was kind of a challenging, highly disputed case in which, in the end, my client received a, who has an IQ of 59, received a 14-year prison sentence. The key contested issues had to do with his extent of mental impairment, whether he was mild to moderately retarded, whether his involvement in the crime was the result of death threats by his cousin to kill him and his family in Mexico, unless he went along with it, and whether he was induced to engage in the second big seven-pound transaction as what would amount to sentencing entrapment by the government's informant. The defense submitted substantial evidence on these things. I've written Crawford, Safety Val Crawford, from the client, and he also took the stand and testified about it. And in addition, an expert reports an evaluation by a psychologist who gave a report and a neuropsychologist, Dr. Judd, who actually testified. And if these arguments had been accepted, there would have been obvious strong grounds for a much lower sentence than the co-defendants received. I point this out because the Court obviously, based mainly on a credibility analysis, rejected these arguments. But a mistake or an error on the part of the Court in how the Court evaluated the credibility would be of key importance. And I think that if I prevail on convincing you that the Court did make an error, it would be very difficult for the government to show that was not, to show that that was Harmon's error beyond a reasonable doubt in light of how contested this case was. I'd like to focus or analyze a little bit on the Fifth Amendment loyal issue. We have the Court rejected two defense contentions, jump going, coercion, and sentencing contract. I'm sorry. I couldn't hear what you just said. Could you put the mic a little bit closer? It's adjustable. Maybe you want me. Is this better? It is for me. The Court rejected the defense factual assertion that there was coercion. My client got involved because his cousin forced him to, and also the sentencing entrapment argument. We're talking about, and the Court considered the failure of my client to tell about these things at earlier points in time as a way of impeaching his credibility. We have the time of arrest at which time my client didn't say anything about either of these two things. And the government hasn't established that no Miranda warnings were given and hasn't even made that contention as far as I know. And under the law, under the Doyle law and its progeny, a defendant who has given Miranda warnings and has a right to remain silent, that his silence cannot be used against him to draw an adverse inference at a later time in the case. This is the freshly minted comment? Yes. What was the district judge referring to silence after arrest or to silence after conviction and through the first whole sentencing proceeding? Because this comment was made at the second sentencing hearing. I take it this story or this version of events wasn't presented at the first sentencing. Well, actually what happened here is that I'd say yes, the comment could have included silence throughout the entire period of time prior to whenever these points were brought up. One important factor, though, is that the sentencing entrapment argument was raised at the first sentencing hearing. And prior counsel at that time argued the facts of the sentencing entrapment, but he couched it as an argument for a departure under Section 5K1.1 of the guidelines kind of unsuccessfully and I think without really proper authority. He brought out those same facts to the judge. Could you give us a record citation of where the counsel in the first sentencing hearing brought out the version of events that the defendant was coerced by his cousin? Yes. I brought that to the attention. I gave that summary of what happened in my sentencing memorandum. In other words, I explained what happened and that this had happened. In your original sentencing memorandum? No, in my sentencing memorandum submitted to this district court judge for resentencing and that's at page 77 of the confidential sentencing materials. I may be able to make myself clear, counsel. What I would like to do is, if you can, give me a record citation of where the coercion story was made known to the judge at the first sentencing hearing. That took place in the we have the transcript during the sentencing argument at the first sentencing and that's in clerks number 143. I'm sorry I don't have the exact page reference there, but it is that was transcribed for the first appeal and that is included. And in addition, Mr. Trejo, the prior counsel at that time, also made that same argument in his sentencing memorandum submitted to the district court at that time and that's clerks number 130. What was the second number? 130. So 143 and 130. And during the argument at the resentencing, the judge at one time interjected and this I'm quoting from page 233 of the excerpt of record. We were talking about different things and the judge said the issue is really whether he's a willing participant in this, whether he was really entrapped as is alleged, whether there were threats. You know, those are all equally tenuous arguments given the circumstances about when the physician was first advocated and what evidence there is that is At this point, it seems that the judge is lumping together entrapment and coercion and talking about that he's considering holding it against the defendant, that these things were not brought up soon enough. Now, since the entrapment argument was brought up at the first sentencing but wasn't brought out at the time of arrest, this must be deemed to be a focus on the defendant's failure to tell about the sentencing entrapment to the arresting officers. And this would be, clearly would be a Doyle violation if my client had been given his Miranda rights. At the first sentencing hearing, did the trial judge make any comment about the coercion, not the entrapment, but the coercion version as being freshly minted? No, Your Honor. And the coercion argument wasn't brought to the attention of the court or opposing counsel until there could have been some informal discussions that I had with Mr. Hill, but which aren't in the record. But when the written safety valve proffer was given prior to the resentencing, that's when that argument was presented first. Mr. Sharia, did you want to make a rebuttal argument? If so, you'd best. I think I would like to reserve some time. Thank you. Good morning. May it please the Court. I'm Douglas Hill, and I'm a Special Assistant United States Attorney for the Western District of Washington, and my actual parent agency is the Pierce County Prosecutor's Office. I have been counsel for the government on this case from the beginning to today and will continue on, I'm sure. I'll touch very briefly on the two issues other than the right to remain silent issue, unless you want me to just go right to the silence issue. I'll do that, then. I have nothing disparaging to say about Mr. Shiraga. He's an honorable opponent, and I really like him a lot, and it's been a great pleasure doing this case with him, but he's mistaken. There was no coercion argument at the first sentencing. I was there. I've always been there. There was an argument made that the defendant was coerced by the confidential source, not the evil cousin Miguel. Evil cousin Miguel does not come up until years later at the time of the second sentencing, and there's a huge distinction there. And it's actually not a coercion argument so much as I think it's called a licensing argument, where at the time of the first sentencing, and at the time, actually, as we're just getting ready to go to trial, the defendant claimed, I was told by the confidential source that he's working for the police. I have delivered dope to the police in the first delivery. Now I'm working for them, and if I cooperate with them, I'll get off the hook. That was the argument that he made getting ready for first trial. The government covered that issue with defense counsel. The defendant decided to plead guilty. He did plead guilty in front of Judge Tanner, and Judge Tanner asked him specifically in that guilty plea, did anybody make you do this? And he said, no, under oath. So I think that resolves that issue at that point in time for Judge Tanner's purposes. I can't frankly remember off the top of my head how that issue or if that issue was even dealt with at the time of the first sentencing, other than to say, Mr. Chagas, correct, that Mr. Trejo made an argument that this is a 5K situation and my client should get credit for that. And I think, if I remember correctly, the way Judge Tanner dealt with it or should have dealt with it was the Court has no business providing a 5K if the government says no. The government has to do it first, and that's the way the rule works, and that's the end of that. So that's how I would address that issue. The – and if you want a cite for that, it's not very well delineated, I don't think, but at Supplemental Excerpts of Record 34, which is page 6 of my sentencing memorandum at the second sentencing, I lay those facts out for Judge Layton at the time of the second sentencing and explain how this – in very sketchy detail, however, I lay it out for Judge Layton that, look, this issue of coercion, if you want to call it that, came up in the first sentencing, but it only had to do with the confidential source, not the evil cousin Miguel. Evil cousin Miguel does not come up until years later, and the first time it comes up is in the defendant's safety valve statement, the lengthy type version that he gives us, and that's when evil cousin Miguel is first raised by the defendant. So the confidential source coercion, that's the idea that the confidential source said, I've got you on this first deal, and if you don't make another transaction, cooperate with us, you're going to be prosecuted. Yes. And you'll find that in the defendant's own safety valve statement in great detail. And he says, you know, the guy – the confidential source told me, you're working for the police, and he says in there, I was so deathly afraid of my evil cousin Miguel, I was really hoping that by my cooperating, the police would end up arresting Miguel, and then I'd be off the hook. And I was really surprised that they arrested me and took me away like that. Now, on the issue, again, of the silence, I think the defendant really in this case invited the judge to make a comment upon the length of time that took place between the first sentencing and the second sentencing. The defendant raises the issue in his safety valve statement that my evil cousin Miguel made me do this, I was so deathly afraid of him, I would rather die than take my family down with me because he made death threats against my family. So, in effect, he's explaining to Judge Layton why he waited so long to reveal this defense. They do it again in Dr. Judd's, and that would be at confidential sentencing materials at page 23, where he talks about how the police would – he hoped the judge would read his safety valve statement. They also raise this with Dr. Judd. Dr. Judd provides a written report that the parties agreed will simply be submitted as evidence. The judge can read it ahead of time to try to get the show on the road and move things along. And in there, Dr. Judd, on the defendant's behalf, explains how the defendant was so deathly afraid of evil cousin Miguel that he literally suffers from post-traumatic stress disorder, and I think what they're really doing there is explaining again to Judge Layton, this is why it took him so long to bring this out. He's so deathly afraid of cousin Miguel, he was too afraid to bring it up earlier. And then the defendant himself, during the hearing, is the one who really brings it out. At excerpts of record 68, the defendant says, and this is – it's on cross examination, but it's not in response to a government question. He just blurts this out. And all this time I've been locked up, I've been suffering. Perhaps if I had talked to you right when I was arrested, I would have been able to give you better information, but I never got that chance. That's what really opened the door to this whole topic at the sentencing hearing. The defendant blurts that out. I believed it wasn't true, so I contested that with him at length on cross examination. And then we put Detective Hudon, Agent Hudon, on the stand to say that is not what happened. We wanted to cooperate with him at the time of his arrest. He didn't want to. And then the issue came up. That's when the defense first objects to this and says, hey, that's a comment on his right to remain silent, and we responded that, no, it's two things. It can be a comment on his right to remain silent, but can also be impeachment of his earlier testimony that he blurted out. And Judge Layton specifically said, I know the difference, and I'm using it for the proper purpose, and I'm not going to use it for the improper purpose. Now, all that having been said, with all of that evidence in front of Judge Layton when it comes time for his ruling, I really think he's been invited to comment on the question of why did it take so long. It has to do with the defendant's credibility, and the whole crux of the issue is, are you going to believe the story about evil cousin Miguel, or are you not, the defendant's credibility is at stake. And Judge Layton, if you look at the overall comments that he makes, his entire set of findings, it's very clear that Judge Layton is simply saying, point blank, I don't believe this guy. I don't believe his defense. I think he operates at a much higher level intellectually than his IQ would reflect. And I think that's one of the issues we raised was, okay, perhaps he is retarded. Perhaps he has a low IQ. But that isn't the ultimate question. The question is, what did he do in terms of a crime, and was he sophisticated as a criminal? And what I think Judge Layton was clearly saying in his ruling was, yes, that's the answer. And he's equally culpable with his co-defendants. Hence, he deserves a sentence the same as the co-defendants. Mr. Hill, so I have a question for you. Yes. If we were to conclude that the comment on the delay was not invited, if we reach that conclusion contrary to your argument, do you then think there's a problem with the judge's statement, or does the government think it's still okay? Well, I think it's okay. But I think the Court would then have to go through the process of determining whether it's harmless error. That's what Brecht and other cases clearly tell us. So how would we know if it's harmless error? Would we be able to assess that? Yes. If it's record error, would we have to send it back to Judge Layton and ask him to just to either reaffirm his sentence or re-sentence, depending on his view, if he's told that he couldn't consider the delay? I think it's fairly predictable for this Court as to how Judge Layton would feel about it when you look at his entire set of comments on his ruling. He clearly does not believe this defendant. He spent two very lengthy, arduous half-day hearings, evidentiary hearings, listening to all the evidence, listening at length to the defendant. And what he's telling you is this guy is not to be believed. And Judge Layton is in the position to not just have the information that you have, but to see the defendant, to hear the defendant, get a real feel for whether the defendant is telling the truth versus telling a lie. And what Judge Layton concluded was, you are not telling me the truth. I'm not buying this. You are as culpable as those other defendants. You get the same sentence. I think that's the message that clearly comes out of Judge Layton's ruling. And I think if you look at his comments, he gives you in fairly good detail what he's thinking and why he's doing what he's doing. So I think at that point you can realize that, look, the time lag has something to do with it, but only in the sense that I don't believe the defendant's excuse about why it took him so long to bring this up. I don't have anything else for the Court unless you have other questions for me. I don't see any from the panel, so thank you, Mr. Hill. Thank you. I appreciate your argument. Mr. Sharaga, you've got a little bit under a minute. It looks like I have 53 seconds. First of all, if the Court finds error here, I don't think it's appropriate for the Court to try to figure out what the appellate court thinks the district court would have been done in resolving properly the issues here. My client has a right to have these contested facts decided by the district court. And if the district court made an error and where the case is so close, it should be the sentence should be vacated and the case remanded so that the district court can does it properly. My client's merely throwing out something about, I would have remembered things better a long time ago. That certainly does not constitute an invitation or a waiver of the point that there's a Fifth Amendment right to remain silent and that it's improper for a court to draw adverse inferences from silence. There's no dispute between me and Mr. Hill as to just what happened as far as the entrapment issue, what I'm calling the entrapment issue. That was raised at the first sentencing, not coercion. But during the entire period of time from arrest, advisement of Miranda writes at the time of arraignment and had told the resentencing, although my client didn't beforehand bring out the facts of what we're calling the coercion facts. He had intact Fifth Amendment rights during that entire time. Okay. I don't – I'm sorry to interrupt, but we're out of time, so if you can conclude, we'd appreciate it. Thank you. Thank you, Mr. Sherrod. The case of United States v. Duran Mercado shall be submitted.
judges: Canby, Gould, Bea